IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| TERRY N. AGENA, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>CLEAVER-BROOKS, INC., *et al.*,<br><br>Defendants. | Case No. 19-cv-00089-DKW-RT<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SEPARATE TRIALS** |

The 73 Plaintiffs joined in this action are either former asbestos plaintiffs or representatives of former asbestos plaintiffs, each connected to one of 56 separate asbestos-related personal injury settlements executed between 2007 and 2015 in separate, underlying lawsuits litigated in either state or federal court. Each of the 73 Plaintiffs now alleges they are entitled to damages for fraudulent inducement of their respective settlement by virtue of Defendants' alleged discovery fraud in the relevant underlying lawsuit. Pursuant to Federal Rule of Civil Procedure 42(b), Defendants have moved for 56 separate trials, Dkt. Nos. 101, 105—one for each settlement at issue—arguing that a single trial would confuse the jury and prejudice Defendants because the facts, law, and circumstances pertaining to each Plaintiff's settlement differ substantially. Plaintiffs maintain that judicial efficiency and convenience favor a single trial because the discovery fraud in each of the 56 settlements overlaps

and any prejudice Defendants claim can be avoided with a limiting instruction to the jury.  Dkt. No. 114.

Because the claims of fraudulent inducement for each of the 73 Plaintiffs "must individually be established," including through expert testimony regarding "the probable amount of settlement in the absence of fraud after considering all known or foreseeable facts and circumstances affecting the value of the claim on the date of settlement,"[1] it would be virtually impossible for a jury to compartmentalize the facts of 56 *different* asbestos personal injury actions and determine how the alleged discovery fraud might have affected the settlement in each case. Accordingly, Defendants' motion for 56 separate trials, Dkt. Nos. 101, 105, is GRANTED.

## FACTUAL & PROCEDURAL BACKGROUND

The Court's October 31, 2019 Order details the alleged facts of this lawsuit. Dkt. No. 71.  Although Plaintiffs have amended their complaint twice since then, the substance of the allegations is principally the same.  As such, only the following facts are relevant to Defendants' pending motion for separate trials.[2]

---

[1] *See Exotics Hawaii-Kona, Inc. v. E. I. du Pont de Nemours & Co.*, 172 P.3d 1021, 1042, 1049 (Haw. 2007).

[2] During the course of briefing on Defendants' pending motion, Plaintiffs filed a third amended complaint (TAC), Dkt. No. 128, pursuant to the parties' stipulation, Dkt. No. 112.  In that stipulation, the parties agreed that the motion would apply to the TAC.  *Id.* at ¶ 2.  Indeed, the strikethrough text in the proposed TAC indicates that the TAC was primarily amended to substitute a Plaintiff as the proper personal representative.  Dkt. No. 112-1, ¶ 13.  Accordingly, the Court will refer to the allegations in the TAC for purposes of this Order.

The 73 individual Plaintiffs joined in this action consist of former asbestos plaintiffs or representatives of former asbestos plaintiffs involved in one of fifty-six separate, underlying asbestos-related personal injury lawsuits litigated against Defendant Cleaver-Brooks, Inc., in either state or federal court.  Each of the asbestos plaintiffs ultimately settled their respective lawsuit against Cleaver-Brooks, resulting in 56 separate settlement agreements executed between 2007 and 2015. Dkt. No. 128, ¶¶ 1–56, 78–79, 82–86, 91, 93, 96.  Each of the 73 Plaintiffs in this action now seeks damages for fraudulent inducement of their respective settlement. *See id.*  Plaintiffs allege that Cleaver-Brooks and its nationwide coordinating counsel concealed adverse information during discovery in each of the 56 underlying actions in order to obtain favorable settlements, and that Plaintiffs "through their counsel" relied upon Defendants' discovery misrepresentations and settled for less than they would have if they had known the truth.  *See id.* at ¶¶ 78–79, 82–86, 91, 93, 96, 147, 155, 171.[3]  Plaintiffs assert three causes of action: (1) fraudulent inducement; (2) violation of the Racketeer Influenced and Corrupt Organizations Act (RICO or Act), 18 U.S.C. § 1961 *et seq.*; and (3) violation of Hawaii's anti-racketeering statute, Haw. Rev. Stat. § 842-2 (Hawaii RICO).  Dkt. No. 128, ¶¶ 99, 103, 111.[4]

---

[3]It is undisputed that in this case Plaintiffs are represented by the same firm, Galiher DeRobertis & Waxman LLP (the Galiher firm), and some of the same attorneys, that represented Plaintiffs in the underlying asbestos actions.  *See Agena v. Cleaver-Brooks, Inc.*, 428 F. Supp. 3d 267, 271 (D. Haw. 2019) (denying defendants' motion to disqualify plaintiffs' counsel).

[4]The Court previously dismissed the federal RICO claims of several Plaintiffs as time-barred, Dkt. No. 71 at 26–28, and Plaintiff Chamizo was not joined in the second or third amended

The 56 underlying actions were filed separately between 2006 and 2014.[5]  In each case, the plaintiff's asbestos claim was unique.  Each claimant was allegedly exposed to asbestos for varying lengths of time between 1940 to 2009.  *See* Dkt. No. 128, ¶¶ 1–56; *id.* at ¶¶ 9, 15, 44.  The claimants were working different jobs at different locations when they were allegedly exposed to asbestos.  For example, the claimants' employment ranged from service in a branch of the armed forces to, *inter alia*, pipefitter; warehouseman; longshoreman and engineman; machinist; welder; boilermaker; woodworker, or mason and plasterer.  *Id.* at ¶¶ 2, 3, 5, 6, 7, 12, 13, 15, 17, 20, 27.  These jobs were performed at a variety of locations, including Pearl Harbor Naval Shipyard aboard various ships; Dillingham Shipyard; the Naval Supply Center in Hawaii; or in "private industries in Hawaii and other locations." *Id.* at ¶¶ 1, 3, 5, 12, 13, 16, 19.  Moreover, some claimants were only employed in their position on a part-time basis.  *Id.* at ¶¶ 14, 40.

When the claimants filed their respective lawsuits, they sued different defendants.  *Compare* Alapasco, Dkt. No. 42-8 at 51–56 (39 defendants), *with* Cabatbat, *id.* at 76–81 (28 defendants).  Some plaintiffs claimed they suffered from mesothelioma, *id.* at ¶ 87,[6] while others alleged they had developed "asbestos pleural

---

complaints, Dkt. Nos. 76, 128.  As such, the parties agree that only 13 Plaintiffs connected to 9 settlements currently have surviving federal RICO claims.  Dkt. No. 101-1 at 3 n.1; Dkt. No. 114 at 24–25; *cf.* Dkt. No. 128, ¶¶ 6, 14, 16, 21, 32, 43, 48, 53, 54.
[5]*See* Dkt. No. 66-1, ¶¶ 3, 55.
[6]*See Cabasug v. Crane Co.*, 956 F. Supp. 2d 1178, 1180 (D. Haw. 2013).

disease and other asbestos-related diseases and injuries to [the] lungs, chest cavity, cardiovascular system and other parts of [the] body."[7]  Some asserted spousal claims (such as loss of consortium), while others did not.[8]  The law of Hawaii applied in some of the cases, while admiralty law applied in other cases involving plaintiffs who had been aboard vessels in dry dock.[9]  Twenty-nine (29) cases were litigated in Hawaii state court, Dkt. No. 128, ¶¶ 78–79, 82–83, 84–86, 96, and twenty-seven (27) cases were litigated in the U.S. District Court for the District of Hawaii.  *Id.* at ¶¶ 91, 93.

The 56 underlying actions resulted in 56 separate settlement agreements that were executed at different times between 2007 and 2015.  *Id.* at ¶¶ 78–79, 82–83, 84–86, 91, 93, 96.  Five (5) settlement agreements were executed between October 24, 2007 and October 2, 2008, *id.* at ¶¶ 78–79, and these claimants allegedly relied upon various misrepresentations in:

> (1) Cleaver-Brooks' June 21, 2007 Master Set of Interrogatories ("June 2007 Master Interrogatories"), which were intended "to apply to all present and future asbestos cases in Hawaii state court," *id.* at ¶¶ 75–76 (incorporating statements in ¶¶ 68–70); and

---

[7]*See Thompson v. Crane Co.*, No. 11-00638 LEK, 2012 WL 1344453, at *2 (D. Haw. Apr. 17, 2012); *Leite v. Crane Co.*, 868 F. Supp. 2d 1023, 1026 (D. Haw. 2012).

[8]*Compare* Aguilar Settlement, Dkt. No. 128, ¶¶ 39, 82(E); Dkt. No. 34-5 at 13 (both spouses executed the settlement agreement), *with*, Almason Settlement, Dkt. No. 128, ¶¶ 3, 79(A); Dkt. No. 34-5 at 13 (only the shipyard laborer executed the settlement agreement).

[9]*See Cabasug*, 956 F. Supp. 2d at 1190.

(2) documents produced by Cleaver-Brooks on August 31, 2007, which included (i) the transcript for the April 2007 corporate deposition of John Tornetta, and (ii) various interrogatory responses, both of which originated in other jurisdictions, *id.* at ¶ 77.

[collectively hereinafter, the "2007 Discovery Materials"]; *see id.* at ¶¶ 78–79.

Twenty-three (23) settlement agreements were executed between April 21, 2009 and October 8, 2011, *id.* at ¶¶ 82–86, and these claimants assert that they relied upon: (1) misrepresentations in the 2007 Discovery Materials, *id.* at ¶¶ 76–77; (2) false statements made at a January 20, 2009 meet-and-confer for plaintiffs' motion to compel, *id.* at ¶ 80; and (3) false testimony provided by John Tornetta at his February 9, 2009 corporate deposition in the Hawaii State Asbestos Litigation, *id.* at ¶ 81. *See id.* at ¶¶ 82–86. In one of these settlements, which was executed on May 6, 2009, the Kahanaoi claimant also allegedly relied on certain misrepresentations made in Cleaver-Brooks' October 13, 2008 document responses in the case. Dkt. No. 128, ¶¶ 82(F), 157.

One (1) settlement agreement was executed on October 14, 2014 in Hawaii state court. *Id.* at ¶ 96. These claimants aver they relied upon: (1) misrepresentations in the June 2007 Master Interrogatories, *id.* at ¶ 76; and (2) Cleaver-Brooks' September 11, 2014 document responses in the case, *id*. at ¶ 95. *See id.* at ¶ 96.

In the underlying cases litigated in federal court,[10] twenty-seven (27) settlement agreements were executed between December 6, 2014 and March 5, 2015, *id.* at ¶¶ 91, 93, and these plaintiffs claim to have relied upon misrepresentations in: (1) documents Cleaver-Brooks produced on April 22, 2013, which included the June 2007 Master Interrogatories, *id.* at ¶ 76, and the transcript of John Tornetta's February 9, 2009 corporate deposition, *id.* at ¶ 81; and (2) Cleaver-Brooks' discovery responses on February 1, 2013; March 8, 2013; December 2, 2013; February 19, 2014; July 17, 2014; and August 6, 2014, *id.* at ¶ 89. *See id.* at ¶¶ 91, 93.[11]

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 42(b) permits a court to order a separate trial of separate claims or issues "[f]or convenience, to avoid prejudice, or to expedite and economize." The moving party has the burden of establishing at least one of these justifications. *Clark v. IRS*, 772 F. Supp. 2d 1265, 1269 (Haw. 2009); *Boone v. City of Los Angeles*, 522 F. App'x 402, 403 (9th Cir. 2013). A district court has "broad discretion" to order separate trials. *M2 Software, Inc. v. Madacy Entm't*, 421

---

[10]Plaintiffs allege that "all discovery . . . in the federal asbestos cases was through [the] Cabasug [case]" because the other cases had been removed to federal court and had been "effectively stayed" pending a challenge to the removal on interlocutory appeal to the U.S. Court of Appeals for the Ninth Circuit. Dkt. No. 128, ¶¶ 88–89.

[11]On June 8, 2015, during David Fitch's deposition as the corporate representative for Cleaver-Brooks in the Cabasug case, Fitch "revealed that Cleaver-Brooks had easy access to Technical Manuals for all the distillers it manufactured from 1956 to the present." Dkt. No. 128, ¶ 92.

F.3d 1073, 1088 (9th Cir. 2005).  In making this determination, relevant factors often

considered include:

> (1) whether the issues are significantly different from one another; (2) whether the issues are to be tried before a jury or to the court; (3) whether the posture of discovery on the issues favors a single trial or bifurcation; (4) whether the documentary and testimonial evidence on the issues overlap; and (5) whether the party opposing bifurcation will be prejudiced if it is granted.

*Clark*, 772 F. Supp. 2d at 1269.  "Courts also consider the complexity of the issues

and possible jury confusion."  *Id.*

It is, therefore, appropriate for a court to order separate trials to avoid "a

difficult question by first dealing with an easier, dispositive issue," *Danjaq LLC v.

Sony Corp.*, 263 F.3d 942, 961 (9th Cir. 2001), or to avoid "potential prejudice and

confusion" that may result from a jury hearing evidence that is only relevant to

claims against certain defendants.  *See Quintanilla v. City of Downey*, 84 F.3d 353,

356 (9th Cir. 1996) (affirming trial court's decision to bifurcate the trial of the

individual officers from that of the city, in part, to avoid prejudice because otherwise

a jury may have awarded plaintiff damages based upon "the strength of evidence

concerning police dog attacks on others.").  On the other hand, it is inappropriate to

order separate trials when "the issue of liability is intertwined with the issue of

damages" and separate trials would result in "confusion and uncertainty" for the

jury. *Miller v. Fairchild Industries, Inc.*, 885 F.2d 498, 511 (9th Cir. 1989) (citation

omitted); *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1021 (9th

Cir. 2004) (holding that the issues of liability for contract damages and punitive damages for tortious breach of that contract were appropriately tried together before the same jury because "the evidence usually overlaps substantially, [and] the normal procedure is to try compensatory and punitive damage claims together . . ." (citation and internal quotation marks omitted)).

## <u>DISCUSSION</u>

Defendants ask the Court to order 56 separate trials in this case—one trial for each settlement agreement at issue—in order to avoid juror confusion and prejudice to Defendants. *See* Dkt. No. 101, ¶ 4; Dkt. No. 101 at 7–10. Plaintiffs contend that any prejudice to Defendants and juror confusion can be "cured" with limiting instructions at trial. Plaintiffs therefore insist on a single trial in the interest of judicial economy and convenience to the parties. Dkt. No. 114 at 1, 23–24. The Court concludes that the nominal efficiency that will result from trying the claims together does not outweigh the reality that it would be virtually impossible for a jury to compartmentalize the numerous factual and legal differences necessary to fairly evaluate the fraud elements of 56 separate settlements. Therefore, for the reasons that follow, this case must be tried in 56 separate trials.

This conclusion is borne out when considering the burden each Plaintiff must carry at trial in order to recover damages for fraudulent inducement of their respective settlement. "Although [Plaintiffs] have filed their claims jointly, they

each have separate claims against [Defendants], and each of their claims must be individually established." *Exotics Hawaii-Kona, Inc. v. E. I. du Pont de Nemours & Co*., 172 P.3d 1021, 1049 (Haw. 2007). Thus, to recover for fraudulent inducement, each of the 73 Plaintiffs in this action must establish the following elements at trial:

> (1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but reasonably believed true by the other party, and (4) upon which the other party relies and acts to his or her damage.

*Exotics*, 172 P.3d at 1042 (emphasis omitted) (quoting *Matsuura v. E.I. du Pont de Nemours & Co*., 73 P.3d 687, 701 (Haw. 2003)).[12] To make out such a claim at trial, the evidence will be different for each of the 56 settlements at issue.

### 1. Plaintiffs Received Different Representations of Material Fact

With respect to the first element of a fraudulent inducement claim, various groups of Plaintiffs received different misrepresentations during discovery. Plaintiffs argue that their counsel relied upon the 2007 Master Interrogatories in "all

---

[12]As for Plaintiffs' federal and Hawaii RICO claims, *see supra* n.4, Plaintiffs must prove: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (citation omitted); *cf. State v. Bates*, 933 P.2d 48, 57 (Haw. 1997) (stating elements under Hawaii RICO); *State v. Ontai*, 929 P.2d 69, 74, 76 (Haw. 1996) (noting that the federal and state RICO claims differ only as to the requirements relating to interstate commerce and "the Hawaii statute requires only one act of racketeering activity," Haw. Rev. Stat. § 842-1, whereas a federal RICO claim requires a "pattern of racketeering activity"). Nonetheless, Plaintiffs may establish their RICO claims and their fraudulent inducement claims by presenting the same evidence. *See Living Designs*, 431 F.3d at 361–70 (involving claims of fraudulent inducement under Hawaii law and federal RICO violations based upon alleged discovery fraud before plaintiffs executed their settlement agreements). As such, the Court will address the need for separate trials only insofar as it relates to the elements of proof for fraudulent inducement.

56 sets of plaintiffs in this action." Dkt. No. 114 at 5, 8–9. That may be true based upon the TAC, but that is the *only* commonality across *all* 56 underlying settlements. This is unavoidable due to the timing of particular misrepresentations in relation to the different times at which settlements occurred. As a result, any *post*-settlement misrepresentations will be irrelevant to a claim that the settlement was induced by fraud.[13] This is because, absent clairvoyance, post-settlement misrepresentations cannot possibly be material to that Plaintiff's settlement and that Plaintiff could not have relied upon such representations. For example, misrepresentations that John Tornetta allegedly made during his February 9, 2009 corporate deposition, Dkt. No. 101-1, ¶ 81, should not be considered by a jury evaluating any of the five settlements finalized between October 24, 2007 and October 2, 2008, *id.* at ¶¶ 78–79. Similarly, any alleged false discovery responses provided in federal court between February 2013 and August 2014, *id.* at ¶ 89, are irrelevant to the twenty-three state court settlements finalized between April 21, 2009 and October 8, 2011, *id.* at ¶¶ 82–86.

Moreover, aside from the different times at which the misrepresentations occurred, there are several other reasons why the materiality of the misrepresentations will inevitably differ for various Plaintiffs. "The materiality of undisclosed information . . . cannot be determined in a vacuum." *Living Designs*,

---

[13]A post-settlement representation revealing the truth about a pre-settlement discovery misrepresentation will, of course, be relevant to a Plaintiff's fraudulent inducement claim. *See infra* Section (2).

431 F.3d at 370 (quoting *TSA Int'l Ltd. v. Shimizu Corp.*, 990 P.2d 713, 728 (Haw. 1999)).  "An omitted fact is material if there is a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [claimant]."  *Id.* (quoting *TSA*, 990 P.2d at 728). Thus, in this case, any alleged misrepresentation related to distillers would clearly be *immaterial* to any underlying settlement arising from exposure to boiler equipment, and vice versa.  Thus, contrary to Plaintiffs' position, the representations and the materiality of each statement in the 56 cases would *not* "substantially overlap," *see* Dkt. No. 114 at 8, 10; rather, the evidence necessary to establish these matters would be predominantly different.

## 2.  Reasonable Reliance is Unique to Each Plaintiff

Even if each Plaintiff received the same material, misrepresentations (and they did not), the evidence related to the fourth element—"reliance" and "damages"—will be widely divergent for each of the 73 Plaintiffs connected to one of the 56 settlements in question.  *See Exotics*, 172 P.3d at 1042.

With respect to reliance, "to prevail on a claim of fraudulent inducement, [the] plaintiffs must prove that their reliance upon a defendant's representations was reasonable." *Exotics*, 172 P.3d at 1029 (quoting *Matsuura*, 73 P.3d at 701).  "Hawaii law establishes, however, that reliance upon representations of an attorney is not per se reasonable or justified."  *Matsuura*, 73 P.3d at 703.  Rather, "the question of

whether one has acted reasonably under the circumstances is for the trier of fact to determine." *Id.* at 701, 704.

Here, whether a Plaintiff "*actually relied* upon [Defendants'] representations" and whether the reliance was reasonable will be distinct for each Plaintiff. *See Living Designs*, 431 F.3d at 370. A Plaintiff may have indeed settled because they believed they lacked the evidence to prove their case at trial. But a Plaintiff also might have settled for any number of reasons unrelated to the merits of their case, such as immediate financial needs, fear of testifying, or the stress of protracted litigation. As such, Defendants are entitled to explore these topics, among others, with each Plaintiff in the crucible of cross-examination and a jury determining the truth.

In the same vein, the truth about certain alleged misrepresentations was revealed at different times, undermining the element of reliance for particular Plaintiffs. For instance, the plaintiffs in those underlying cases in federal court would have learned on June 8, 2015, during David Fitch's corporate deposition, that "Cleaver-Brooks had easy access to Technical Manuals for all the distillers it manufactured from 1956 to the present," Dkt. No. 128, ¶ 92. Thus, those claimants who settled after Fitch's deposition on June 8, 2015 (*i.e.*, Calvey, Leite, Selitto, Rosaldo, Cabasug, Raston, Shimazu, Matsumoto, Capati, and Robinson),[14] would hardly be "justified in relying" upon any contrary discovery responses provided

---

[14] *See* Dkt. No. 128, ¶ 91(B), (O), (P), (S); *id.* at ¶ 93.

before June 8, 2015.  *See Exotics*, 172 P.3d at 1032.  Likewise, on December 3, 2013, Cleaver-Brooks disclosed that its Water Tech product lines contained asbestos, Dkt. No. 128, ¶ 105, and, thus, the twenty-eight plaintiffs who settled after December 3, 2013,[15] could not have reasonably relied upon contrary omissions before December 3, 2013.  Any jury will inevitably be frustrated and confused during a single trial for all 56 settlements, as they attempt to sort through these factual subtleties on a settlement-by-settlement basis.  Of course, Plaintiffs would attempt to summarize and present this mass of information in the manner most conducive to juror comprehension.  But that effort has been difficult enough for this Court in adjudicating the motions thus far presented with far fewer facts than would be expected at trial.  The same task for a jury would be Herculean and would undoubtedly result in prejudice to Defendants.  The Court declines to facilitate such a result.

Although Plaintiffs insist that "it was not the 56 individual clients who relied upon Cleaver-Brooks' false discovery answers, but rather the Galiher firm attorneys," and that the "clients did not read Cleaver-Brooks' interrogatory answers or depositions before they signed their releases," Dkt. No. 114 at 8–10, this is relevant only insofar as it concerns the information communicated to Plaintiffs in the underlying actions.  *See* Haw. R. Prof'l Conduct 1.4(a)(1)–(2), (6) & cmt. 5

---

[15]*See* Dkt. No. 128, ¶¶ 91, 93, 96.

(establishing a lawyer's duty to communicate with a client and ensure they "have sufficient information to participate intelligently in decisions," such as whether to settle); Haw. R. Prof'l Conduct 1.2 (a) & cmt. 1 (explaining that the decision "whether to settle a civil matter, must be made by the client"). The Galiher firm and its attorneys are not Plaintiffs in this action and reliance is not distilled to a unitary inquiry simply because "numerous plaintiffs settled their claims based on recommendations from one law firm . . ." Dkt. No. 114 at 8. Each of the 73 Plaintiffs must "individually" establish his/her reliance upon a misrepresentation and that such was reasonable, along with the other elements of his/her fraudulent inducement claim. *See Exotics*, 172 P.3d at 1029, 1042. That will involve essentially the same quantum of proof whether the claims are tried together or in 56 separate trials, but the latter option is far less likely to overwhelm a jury and result in prejudice to Defendants.

### 3. Each Plaintiff's Damages Will Vary Based on Numerous Factors

That leaves the innumerable differences in the measure of damages for each Plaintiff. In a claim for fraudulent inducement of a settlement agreement, the measure of a plaintiff's damages is "the probable amount of settlement in the absence of fraud after considering all known or foreseeable facts and circumstances *affecting the value of the claim on the date of settlement*," minus "the amount in settlement already received." *Exotics*, 172 P.3d at 1038, 1042 (emphasis added) (citation and

internal quotation marks omitted); *accord Living Designs*, 431 F.3d at 368. Thus, the damages for each Plaintiff in this case "would be the difference between the fair settlement value absent fraud and the amount of the [P]laintiffs' actual settlement." *Exotics*, 172 P.3d at 1045; *see also Living Designs*, 431 F.3d at 364, 368 ("The critical consideration is the settlement value of the case on the date settlement was reached."). Whether a defendant's "fraudulent misrepresentation caused damage to the plaintiffs . . . by preventing them from receiving the 'fair compromise value' of their claims is one upon which the trier of fact must be guided by expert legal testimony." *Exotics*, 172 P.3d at 1045. In evaluating an underlying settlement, relevant factors for a plaintiff's expert(s) to address include:

> (1) the type of case and difficulty of proof at trial, *e.g.*, rear-end motor vehicle collision, medical malpractice, product liability, etc.; (2) **the realistic approximation of total damages that the plaintiff seeks**; (3) **the strength of the plaintiff's claim and the realistic likelihood of his or her success at trial;** (4) the predicted expense of litigation; (5) the relative degree of fault of the settling tortfeasors; (6) the amount of consideration paid to settle the claims; (7) the insurance policy limits and solvency of the joint tortfeasors; (8) the relationship among the parties and whether it is conducive to collusion or wrongful conduct; and (9) any other evidence that the settlement is aimed at injuring the interests of a non-settling tortfeasor or motivated by other wrongful purpose.

*Exotics*, 172 P.3d at 1044 (emphasis added); *see also id.* at 1049 (holding that because plaintiffs' experts did not "explain how [defendant]'s conduct affected the plaintiffs' evaluation [of their underlying claim], what each plaintiff claimed as his damages in the product liability cases at the time he settled and what he recovered,

- 16 -

and how the settlement factors would apply to each plaintiff's case," plaintiffs failed to prove the amount of settlement fraud damages, and, thus, summary judgment in favor of defendants was appropriate).

Here, the complexity involved in determining the issue of damages and the factual differences between the value and strength of each Plaintiff's underlying claim counsels in favor of 56 separate trials. Even if every Plaintiff received the same (1) misrepresentations (2) of material fact and (3) reasonably relied upon these same representations (which, as explained, is not the case here), those representations must then be factored into the settlement value of each Plaintiff's underlying asbestos case based on the individual facts of each case. That cannot be done on an across-the-board basis. *See Exotics*, 172 P.3d at 1049. As the facts of this case illustrate, there are substantial differences among the various underlying claims, including: work history related to asbestos-exposure; the asbestos-related disease; the proof of Cleaver-Brooks' product exposure; the number and identity of other defendants in the underlying action; the relative degree of fault of those other defendants; the presence or absence of spousal claims; the predicted expense of the underlying action; the settlement date and amount with Cleaver-Brooks; the settlement amounts with other defendants; and the claimant's future income.

If the claims here are grouped together in one trial, a jury would be required to engage in the various experts' analysis regarding the value of the claims for 73

Plaintiffs connected to one of the 56 underlying settlements, and then the jury must compartmentalize this mountain of information so as to fairly determine the damages for each Plaintiff on an individual basis.  That is a mental exercise that the lay juror is ill-equipped to perform, and to impose such a task would give new meaning to the phrase "cruel and unusual punishment."   Moreover, it is not feasible to entertain bifurcated trials on the issue of liability for particular groups of Plaintiffs (*i.e.*, the alleged misrepresentations) followed by 56 separate trials to determine the issue of damages because "the issue of liability is intertwined with the issue of damages" and separate trials would result in "confusion and uncertainty" for the jury.  *Miller*, 885 F.2d at 511 (citation omitted); *Hangarter*, 373 F.3d at 1021.  Therefore, the Court is convinced the claims in this case must be tried in 56 separate trials.

The remaining contentions raised by Plaintiffs do not command a different result.  First, the cases Plaintiffs cite are irreconcilable with the instant action.  Dkt. No. 114 at 6–7, 12–13, 25.  This case does not involve a mere handful of claimants joined in one action.  *See Dowkin v. Honolulu Police Dep't*, No. 10-00087, 2011 WL 3021784, *2 (D. Haw. July 22, 2011) (three police officers' related claims of discrimination); *see Davis v. Mason Cty.*, 927 F.2d 1473, 1477–80 (9th Cir. 1991) (four plaintiffs' excessive force claims), *superseded by statute on other grounds as stated in Davis v. City & Cty. of San Francisco*, 976 F.2d 1536, 1556 (9th Cir. 1992). Nor does this case involve the consolidation of three federal securities cases arising

from a Ponzi Scheme. *See Dusky v. Bellasaire Investments*, No. SACV07-874, 2007 WL 4403985, *1, *6 (C.D. Cal. Dec. 4, 2007). And the issue presented here is not whether to consolidate related federal securities *class actions*. *See Kaplan v. Gelfond*, 240 F.R.D. 88, 90 (S.D.N.Y. 2007) (eight cases); *In re Cendant Corp. Litig.*, 182 F.R.D. 476, 478 (D.N.J. 1998) ("[C]onsolidation is common in federal securities class action cases."). In contrast to the complexity involved here in determining each Plaintiff's damages, the measure of damages for securities fraud is, generally speaking, a matter of simple arithmetic.[16] Moreover, this is not a class action. Yet Plaintiffs appear to view this case as a de facto class action without ever having satisfied Rule 23(a)'s rigorous requirements of "numerosity, commonality, typicality, and adequacy of representation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011); Fed.R.Civ.P. 23(a). Plaintiffs across-the-board theory of liability and damages is incompatible with the facts of this case.

Second, Plaintiffs miss the mark in arguing that "testimony about the merits or lack thereof, of plaintiffs' products liability claims are not relevant." Dkt. No. 114 at 11 (quoting *Matsuura v E.I. duPont deNemours & Co.*, Nos. 96–01180 SOM–LEK, 2006 WL 5249742, *2 (D. Haw. Dec. 21, 2006)). Aside from the fact that

---

[16]*See, e.g.*, *Dunleavy v. Nadler* (In re *Mego Fin. Corp. Sec. Litig.*), 213 F.3d 454, 462 & n.6 (9th Cir. 2000) (explaining that out-of-pocket damages equal "the difference between the price [paid] ($5/share) and [the] value ($1/share) of the stock on the date of purchase," meaning the plaintiff is entitled to damages in the amount of "$4 per share"); *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 621 (9th Cir. 1981).

Plaintiffs rely on non-binding precedent, the proposition for which Plaintiffs cite *Matsuura*, 2006 WL 5249742, *2, is no longer good law in light of the Hawaii Supreme Court's more recent decision in *Exotics*.  In that case, the court was emphatically clear that "one factor among many relevant factors in determining the fair compromise value of a particular claim on the date of settlement **is the validity -- or lack thereof -- of the plaintiffs' claim for damages at the time of trial**." *Exotics*, 172 P.3d at 1046 (citation omitted).  As noted, this inquiry will not be the same for each Plaintiff.

Third, the problems inherent in holding a single trial are not remedied simply because "Plaintiffs plan on using one or two experts to testify as to the amount of damages for all 56 Plaintiffs."  Dkt. No. 114 at 2.  Nor does it make any difference that "the underlying theory and testimony on how each case is valued" might be consistent "across all 56 cases."  *Id.* at 11.  By these standards, any number of claimants asserting the same cause of action could join in a lawsuit and split the tab on a single trial.  But that is not the law.  The fact remains that Plaintiffs' experts must still testify as to "how the settlement factors would apply to **each plaintiff's case**."  *Exotics*, 172 P.3d at 1049 (emphasis added).  Similarly, to the extent there will also be overlapping testimony from the attorneys (*e.g.* DeRobertis and Waxman) regarding their reliance on Defendants' representations, Dkt. No. 114 at 10–11, this testimony (repetitive as it may be) will still have to be provided with

respect to *each Plaintiff.  See, e.g.*, *Exotics*, 172 P.3d at 1029, 1042; *supra* Section (2).  And, moreover, discovery costs will not increase by virtue of conducting 56 separate trials because Cleaver-Brooks has agreed to consolidated discovery to the extent it is practical.  *See* Dkt. No. 101-1 at 18; Dkt. No. 114 at 13.  Plaintiffs elected to proceed in this single action and undoubtedly would have incurred exponentially greater discovery costs had they filed in any other manner.

Fourth, contrary to Plaintiffs' position, the state of the law is a relevant consideration in the value of a settlement.  *Exotics*, 172 P.3d at 1044.  The parties argue at length about the legal differences, if any, between asbestos torts under maritime law and state law with respect to the standard for causation; caps on punitive damages; and the availability of punitive damages or compensation for loss of consortium if the claimant is a "seafarer," and the parties dispute whether the settlement value of each case would be affected by these differences in each case. Dkt. No. 101-1 at 11–13; Dkt. No. 114 at 14–20.  Plaintiffs, however, contend that any substantive differences between state and maritime law are irrelevant in this fraud case because "Cleaver-Brooks not only never actually made the arguments about maritime law it now makes, but it also never even raised them informally in negotiations" and "likewise never pursued, and certainly never received, any ruling

actually imposing any of the limits . . . it now raises." Dkt. No. 114 at 20–21.[17]

Plaintiffs misunderstand *Exotics*.   "[T]he compromise range of a claim will be different at different points in time based upon what is known, *or reasonably foreseeable*, at the time of the compromise, *including the state of the law*." *Exotics*, 172 P.3d at 1044 (emphasis added).   A party may never express such a concern, including during negotiations with opposing counsel, but the state of the law may still have factored into the parties' reasons for settling.   Rather than risk an adverse determination on what perhaps may have been an unsettled legal issue, for instance, a plaintiff may have agreed to settle based, in part, on discussions of the law with his/her own counsel.   *Id.*; *Carson v. Am. Brands*, 450 U.S. 79, 87 (1981) (observing that parties settle "to avoid the costs and uncertainties of litigation.").   This underscores the necessity of separate trials.

For similar reasons, even if Cleaver-Brooks or Plaintiffs had not discovered certain facts at the time of settlement, these facts could be relevant because a jury, guided by expert opinion, must consider "all known *or foreseeable facts and circumstances affecting the value of the claim on the date of settlement*." *Exotics*, 172 P.3d at 1038, 1042 (emphasis added).   In each of the 56 settlements, each party had to consider the risk that the other party would discover adverse, undisclosed

---

[17]Plaintiffs acknowledge that at least some of these legal differences "would theoretically have affected [the] value" of some cases.   *See* Dkt. No. 114 at 21.

facts if the case did not settle and discovery continued.  "[T]he agreed upon amount undoubtedly [was] not the 'best case scenario' for either side, but rather [it was] a compromise of their respective positions to avoid the multiple risks of trial where they might face their 'worse case scenario.'"  *Id.* at 1044.  As a result, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."  *Id.* at 1045 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974)).  Therefore, because this case may involve facts that were not discovered in the underlying actions, the factual differences pertaining to each case could be even greater than anticipated.

Lastly, the prejudice to Defendants and juror confusion explained above cannot simply be "cured" with limiting instructions at trial, as Plaintiffs argue.  Dkt. No. 114 at 23–24.  "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction . . . ."  *Bruton v. United States*, 391 U.S. 123, 129 (1968) (quoting *Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring)).  Although there is an "almost invariable assumption . . . that jurors follow [a court's] instructions," *see Richardson v. Marsh*, 481 U.S. 200, 206 (1987),  there are times when "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the

jury system cannot be ignored." *Id.* at 207 (quoting *Bruton*, 391 U.S. at 135–36); *see Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 603 (9th Cir. 2016) (holding district court should have bifurcated the case because limiting instruction was insufficient to mitigate prejudice). Such is the case here. If Plaintiffs' claims are tried together, the Court would need to issue limiting instructions to the jury regarding compartmentalization that they would not even begin to be able to implement. *See Bruton*, 391 U.S. at 132 n.8 (a "recommendation to the jury of a mental gymnastic which is beyond, not only their powers," but that of any person, makes little sense) (citation and internal quotation marks omitted). 56 separate trials are the only way to truly avoid asking the jury to perform tasks that they cannot reasonably do and avoid prejudicing Defendants.

In sum, this case bears all the hallmarks that counsel in favor of 56 separate trials: (1) the issues across the underlying cases are significantly different from one another; (2) the issues are complex; (3) the documentary and testimonial evidence on the issues will be substantially different; (4) the claims will be tried before a jury; (5) discovery costs will not significantly increase as a result of separate trials; and (6) each Plaintiff will still have his/her day in court. *See Clark*, 772 F. Supp. 2d at 1269. On the other hand, a single trial for all 56 settlements would undermine the focus of the trier of fact, confuse the issues, and prejudice Defendants. Accordingly,

the Court concludes that this case must be tried in 56 separate trials—one for each settlement at issue.[18]

## CONCLUSION

For the reasons set forth herein, Defendants' Motion for 56 Separate Trials, Dkt. Nos. 101, 105, is GRANTED.

IT IS SO ORDERED.

DATED: June 8, 2020 at Honolulu, Hawaiʻi.



Derrick K. Watson
United States District Judge

_Terry N. Agena, et al. v. Cleaver-Brooks, Inc., et al._; Civil No. 19-00089-DKW-RT;
**ORDER GRANTING DEFENDANTS' MOTION FOR SEPARATE TRIALS**

---

[18]Of course, the Court is not unmindful of the burden that 56 trials would place on all concerned, including the Court.  Trial, however, is not scheduled to begin until July 2021.  Counsel have already advised that they are busily working on settlements, one of which has already been or nearly been achieved.  In other words, the posture of this case is very likely to be markedly different when trial comes.  This Order is therefore without prejudice to proposals from any party concerning how best to efficiently try this case as July 2021 nears.